**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **STEVE KUITHE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION 08-0458-WS-C** |
| | ) |
| **GULF CARIBE MARITIME, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter is before the Court for final resolution following bench trial.  The parties have submitted a rash of post-trial briefs and motions.  (Docs. 154-56, 158-60, 166-67, 170, 173-74, 176-80).[1]  After carefully considering the foregoing, and the evidence and argument of counsel, the Court  issues these findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

## BACKGROUND

In May 2006, the plaintiff was working for the defendant as a Jones Act seaman on the Chem Caribe ("the Barge").  The parties disagree on pretty much everything else.  The plaintiff asserts that, in the course of descending a fixed ladder on the Barge, he

---

[1] For reasons expressed elsewhere in this order, the defendant's motion for judgment on partial pleadings, (Doc. 154), is **denied**.  For reasons stated elsewhere in this order, the plaintiff's motion for judgment as a matter of law, (Doc. 158), is **granted** with respect to an award of maintenance and cure and **denied** with respect to willful failure to pay maintenance and cure.  The defendant's motion to strike, (Doc. 166), is **denied as moot**, as the Court has not relied on the material made the subject of the motion.  The plaintiff's motion to strike is **denied**, because the cure for bad arguments is to ignore or reject them, not to strike them, and because the deposition testimony the defendant improperly cited is substantively the same as the witness' trial testimony.  The plaintiff's motion to file a reply memorandum in support of his motion to strike, (Doc. 179), is **denied**.

injured his left knee. The plaintiff describes the ladder and its immediate vicinity as constituting an unseaworthy condition and alleges that he was injured in consequence of the defendant's negligence. The plaintiff also seeks recovery of maintenance and cure.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[2]

In 1989, the plaintiff experienced a torn lateral meniscus in his left knee, for which he underwent corrective arthroscopic surgery. In the course of this treatment, the plaintiff's physician discovered that the plaintiff's left anterior cruciate ligament ("ACL") was torn or absent and non-repairable. On at least six occasions in 1991 and 1992, the plaintiff's left knee gave way due to his deficient ACL. His physician recommended an ACL reconstruction, but the plaintiff demurred upon discovering his worker's comp claim for the 1989 injury was closed. The plaintiff had no instances of left knee instability after 1992. The defendant hired the plaintiff in October 2003, and the subject accident occurred on May 29, 2006.

### A. Negligence and Unseaworthiness.

The Barge has four fixed ladders used for traveling between the Barge and its tug. In May 2006, the deck directly inboard of the port aft ladder was almost entirely blocked by a welded containment box set back two inches from the skin or shell of the Barge.[3] In addition, the rungs of the ladder were no more than ¾ inch wide, and the clearance between the rungs and the skin was only three inches. Moreover, the ladder did not have stringers or stanchions, adjacent to the vertical legs to which the rungs were welded, to be used as handholds. Instead, there were three possible places to grip: (1) a single

---

[2] All facts are found by a preponderance of the evidence.

[3] The defendant relies on measurements taken after the containment box present on May 29, 2006 had been replaced with a smaller one. The measurements of this replacement containment box are irrelevant. However, even the smaller containment box blocked all but the aft four inches of the ladder's rungs.

stanchion, near the skin but almost a foot aft of the aft vertical leg; (2) a three-inch diameter gooseneck pipe, even with the forward vertical leg but almost two feet inboard, with its upper crook about thirty inches above the deck; and (3) the thin lip of the containment box, about one foot above the deck and two inches from the skin.

This unhappy combination of features required those using the ladder to engage in gymnastics to access the ladder from the deck in order to descend. The obstruction of the containment box required users to approach the ladder not straight on but sideways and from a sharp angle aft of the ladder. This angle, combined with the thin rungs and narrow gap between rungs and skin, required users to first place their left foot on a rung at an angle of about 45 degrees to the rung, rather than directly across it at an angle of 90 degrees. These circumstances, plus the awkward placement of the possible handholds (too far aft, too far inboard, and/or too low) required various contortions to allow the user to shift his weight from the deck to the ladder and to square his body with the ladder, all of which raised an unreasonable risk of twisting and injuring a knee.

The plaintiff attempted to descend the port aft ladder on May 29, 2006 in the manner ordinarily used by himself and other crew members. He placed his left foot on the second rung at a 45-degree angle to the rung, held on to the containment box, and swung around in order to get his right foot on the ladder and square up. As he did so, his left knee twisted when, as his left foot pivoted on the rung, the toe of his boot caught against the skin of the vessel, causing his lower leg to stop while the rest of his body continued turning. He felt a pop in his left knee and an intense pain, and he dropped to the deck of the tug some eight feet below. The pop was the tearing of his lateral and/or medial meniscus, which were surgically removed shortly thereafter.

Claims under the Jones Act are founded on negligence. *Cooper v. Meridian Yachts, Ltd*., 575 F.3d 1151, 1160 n.2 (11th Cir. 2009). In a Jones Act case, "the owner is negligent only if he fails to use reasonable care to maintain a reasonably safe place to work." *Ivy v. Security Barge Lines, Inc*., 585 F.2d 732, 741 (5th Cir. 1978). "Under familiar principles of negligence, in Jones Act cases, there must be some evidence from which a jury can infer that the unsafe condition existed and that the owner either knew or,

in the exercise of due care, should have known of it." *Perry v. Morgan Guaranty Trust Co.*, 528 F.2d 1378, 1379 (5th Cir. 1976); *accord Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1543 (11th Cir. 1989) ("To find that [the employer] was negligent in its duty to provide a safe working environment for [the plaintiff], the jury had to find some evidence that the condition … was unsafe, that the [employer] knew or should have known of the danger, and that it did nothing about the danger."). "[I]n [a] Jones Act case, sufficient evidence exists to support [a] jury verdict on [the] issue of causation if employer negligence played even [the] slightest part in producing injury." *Id.* at 1542.

The condition of the port aft ladder on May 29, 2006 constituted an unsafe condition. The defendant knew, or in the exercise of due care should have known, of this condition and the danger it posed. The defendant nevertheless did nothing about the danger. The defendant did not use reasonable care to maintain a reasonably safe place to work. The condition, and the defendant's failure to remedy it, played more than a slight part in producing the plaintiff's injury. The plaintiff has established all elements for recovery under the Jones Act.

An employer "has an absolute, nondelegable duty to ensure that its vessels are seaworthy." *Deakle v. John E. Graham & Sons*, 756 F.2d 821, 825 (11th Cir. 1985). "Under the seaworthiness doctrine, a shipowner has a duty to furnish a vessel and equipment reasonably fit for their intended use." *Complaint of Merry Shipping, Inc.*, 650 F.2d 622, 623 (5th Cir. 1980). "This duty is absolute and divorced from concepts of negligence." *Id.* Unlike under a negligence standard, "the owner's duties are not conditioned on notice or fault." *Deakle*, 756 F.2d at 826; *accord Clevenger v. Star Fish & Oyster Co.*, 325 F.2d 397, 400 (5th Cir. 1963) ("This duty is non-delegable and pertains to latent as well as patent defects; neither ignorance nor due diligence will serve as an adequate defense.").

"The standard required to prove causation as a result of the vessel's unseaworthiness is more demanding than that for recovery under the Jones Act, and requires proof of proximate causation in the traditional sense." *Comeaux v. T.L. James & Co.*, 702 F.2d 1023, 1024 (former 5th Cir. 1983). Thus, "[a]n unseaworthy condition is a

'legal cause' of damage only if it directly and in natural and continuous sequence produces, or contributes substantially to producing such damage." Eleventh Circuit Pattern Jury Instruction (Civil) 6.1.

The port aft ladder as it existed on May 29, 2006 was not reasonably fit for its intended use. The unseaworthy condition of the ladder was a proximate cause of the plaintiff's injury. The plaintiff has established all elements for recovery under the doctrine of unseaworthiness.

In arguing that it was not negligent and that the ladder was not an unseaworthy condition, the defendant relies primarily on the following: (1) the opinion of its liability expert; (2) clean certificates of inspection from the Coast Guard; and (3) clean inspections by the American Bureau of Shipping ("ABS"). None of this evidence is impressive, and even in combination it does not alter the Court's finding that the defendant was negligent and that the ladder constituted an unseaworthy condition. While not exclusive, some of the deficiencies in the defendant's evidence are summarized below.

Certificates of inspection "are of course evidence bearing on the question of due care, but they are not more." *Sabine Towing Co. v. Brennan*, 72 F.2d 490, 494 (5th Cir. 1934). The Court accepts that the Coast Guard never cited the defendant in connection with the ladder and that the ABS never mentioned any problem with it. However, the Court finds that the Coast Guard and ABS did not specifically examine the ladder for fitness, either on its own or in the context of the awkward handholds and gross obstruction by the containment box. Accordingly, the absence of citation is not significant. Even had the Coast Guard or ABS consciously approved of the ladder and its environment, the Court would still find the ladder unsafe and an unseaworthy condition for reasons set forth above.

The expert's opinion relies largely on the Coast Guard and ABS inspections discussed above. Its third major leg is the defendant's purported compliance with a federal regulation. As a threshold matter, the regulation does not apply to vessels but only to shore-based marine terminal facilities. Nor did the subject ladder comply with

the regulation. By its terms, the regulation generally requires at least seven inches distance between the rung center line and the nearest stationary object, and it forbids distances below 4.5 inches; the subject ladder, however, had clearance of less than 3.5 inches.[4] Moreover, it is not the inadequate clearance alone that rendered the ladder unsafe, but inadequate clearance *in combination with* the obstructed access and awkward handholds, which conspired to require challenging and dangerous maneuvering. No regulation or other material cited by the defendants remotely supports the unlikely proposition that this combination of features is appropriate.

The defendant argues it was not negligent because it did not have notice of any unsafe condition of the ladder, since no employee complained of it and the Coast Guard and ABS did not cite it. As noted above, what is required is that the defendant "should have known" of the dangerous condition. Because the unsafe condition of the ladder was open and obvious, the defendant should have known of it, and it is irrelevant that no one expressly advised the defendant that the ladder was dangerous. Moreover, although actual knowledge of the danger is unnecessary, the defendant had such knowledge because the former captain told crew members the ladder was too dangerous to use.

The defendant argues that the negligence claim fails because the obstructed approach, awkward handholds and inadequate rung clearance played no role in producing the plaintiff's injury. This is untenable. But for these attributes, the plaintiff would have approached the ladder directly, grabbed stanchions adjacent to the vertical legs, and stepped on each rung perpendicular to its length – as he and other crew members routinely did when using the other three ladders. He would not have been required to step on the rung almost parallel to its length from an abnormal angle, maneuver around a

---

[4] The defendant emphasizes that, for ladders (like this one) installed before October 1983, the regulation requires only a four-inch clearance. But the ladder violated even the four-inch rule. Of greater significance is that the current regulation, as well as various Coast Guard regulations and other materials, consistently emphasize the need for a clearance of seven inches or so. This evidence simply underscores the already obvious fact that a clearance of under four inches, especially for a ladder having as many additional problems as this one, is too little.

containment box, and then square up in order to descend the ladder, all while using ill-suited, makeshift handholds.

Similarly, and with no better result, the defendant argues that the ladder's condition was not a legal or proximate cause of the plaintiff's injury for purposes of his unseaworthiness claim because the plaintiff already had a torn or missing ACL, which allowed his meniscus to tear when he twisted his knee. Whatever the plaintiff's pre-existing condition and its role in causing his injury, the configuration of the ladder directly and naturally contributed substantially to the plaintiff's injury.

The defendant proposes that, without notice of the plaintiff's special susceptibility to knee injury due to his deficient ACL, it cannot be liable, either for want of causation or for some other, unstated reason. (Doc. 167 at 5, 22). The only case on which the defendant relies for this unlikely proposition involved a passenger bringing suit under Massachusetts law, not a seaman bringing suit under the Jones Act and the unseaworthiness doctrine. The Court rejects the defendant's argument as unsupported.

### B. Comparative Negligence.

"Under maritime law, the comparative negligence of a plaintiff applies equally to both theories of recovery [Jones Act negligence and unseaworthiness]. … In either circumstance, a plaintiff's contributory negligence will not bar his recovery, but will reduce his damage award." *Scott v. Fluor Ocean Services, Inc*., 501 F.2d 983, 984 (5th Cir. 1974). The burden is on the defendant to establish the plaintiff's comparative negligence. *See American Dredging Co. v. Lambert*, 153 F.3d 1292, 1297 (11th Cir. 1998) (trial court did not err in failing to shift to the plaintiffs the burden of showing the decedents were not comparatively negligent); *accord Neely v. Club Med Management Services, Inc*., 63 F.3d 166, 200 (3rd Cir. 1995).

"A seaman, then, is obligated under the Jones Act to act with ordinary prudence under the circumstances," including the seaman's "experience, training, [and] education."

*Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997) (en banc).[5]  "[T]he seaman must in some circumstances exercise reasonable care to prudently choose the right equipment for the work to be done, if that equipment is available."  *Bobb v. Modern Products, Inc.*, 648 F.2d 1051, 1057 (5th Cir. 1981).  Thus, comparative negligence is an available defense if the plaintiff "makes use of a defective appliance knowing that a safe one is available."  *Field v. Waterman Steamship Corp.*, 104 F.2d 849, 851 (5th Cir. 1939) (internal quotes omitted).[6]  "However, a seaman has no duty to find the safest way to perform his work."  *Comeaux* , 666 F.2d at 300.  "This is especially true when his supervisor … knows the working method used by the seaman, and does nothing about it."  *Dempsey*, 876 F.2d at 1543 (internal quotes omitted).

The defendant suggests that the manner in which the plaintiff attempted to descend the ladder was negligent.  It is, however, the same way other crew members did so.  Moreover, the plaintiff's superiors observed the plaintiff descend in this manner on multiple occasions and did not consider it objectionable.  That is, they knew of the method employed by the plaintiff and did nothing about it.  Whether or not slight variations on the manner of gaining access to the ladder and beginning a descent were or could have been employed,[7] the plaintiff's method was reasonable under the circumstances, and nothing in his experience, training or education suggests otherwise.[8]

---

[5] Several former Fifth Circuit cases describe the seaman's duty as "slight."  *Bobb v. Modern Products, Inc.*, 648 F.2d 1051, 1057 (5th Cir. 1981) ("[T]he seaman has some duty to use reasonable care, even though that duty is slight.");  *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 223 (5th Cir. 1975) ("[T]he seaman's duty to protect himself … is slight.").  The *Gautreaux* Court overruled these cases, replacing them with the test quoted in text.  107 F.3d at 337, 339.  So far as the Court can determine, the Eleventh Circuit has not done likewise.  Nevertheless, because the defendant asks the Court to apply *Gautreaux* and the plaintiff fails to object, the Court utilizes the Fifth Circuit standard.

[6] Such conduct does not, as the defendant asserts, (Doc. 167 at 20), bar recovery.  To the extent the California trial court decision on which the defendant relies actually stands for this proposition, it is at irreconcilable odds with Eleventh Circuit law.

[7] The alternate method suggested by the defendant was not even possible in May 2006, when a larger containment box was in place.  Moreover, and as demonstrated in the defendant's (Continued)

[8]

The defendant argues the plaintiff was negligent because he used the port aft ladder when a portable ladder was available.[9]  The portable ladder was not "available" in any meaningful sense, because it required a substantial amount of work to set up and even then would remain insecure because of tug and barge movement.  Moreover, the portable ladder was not a safe alternative because, as the defendant's captain testified, using the portable ladder is more dangerous than using the port aft ladder.

The defendant argues the plaintiff was negligent – and perhaps negligent per se – because he violated certain regulations concerning crew members' ability to climb vertical ladders and their providing truthful medical information.  (Doc. 154 at 4).  The defendant elsewhere correctly notes that "description[s] of alleged negligence" not listed in the joint pretrial document are out of the case and "should be stricken."  (Doc. 167 at 2).  The joint pretrial document does not assert comparative negligence based on violation of any regulation.  Accordingly, no such theory is in the case.

_____

staged video, this method resulted in unusual and unsafe forces on the actor's left knee, as he transferred weight to his left leg and kept his left leg frozen perpendicular to the skin as his body twisted 90 degrees relative to his knee in order to square with the ladder.  It was to avoid such unnatural stressess on the knee that the plaintiff and others reasonably pivoted on their left foot.

[8] The defendant's biomechanical expert testified it was not necessary for the plaintiff to twist his left knee in accessing the ladder.  This is correct.  As discussed in text, his knee twisted only because, due to the configuration of the ladder and its approach, his pivoting left foot caught the skin and stopped while the rest of his body unavoidably continued its rotation to square up.  Had the approach not been obstructed, the rung clearance been wider, and/or the handholds better situated, this would not have occurred.

The plaintiff and others had successfully employed this method of negotiating the port aft ladder on other occasions only because they had perfectly placed their left foot so it would pivot without being blocked by the skin.  That the plaintiff's foot placement on May 29, 2006 was imperfect does not reflect negligence on his part but the defendant's negligent acceptance of a ladder with an inexcusably small margin of error.

[9] The defendant does not argue that the port forward ladder, or either of the starboard ladders, was available.  The Court finds they were not available, since the captain tied up to the port aft quarter of the Barge and routinely resisted tying up elsewhere.

"[C]ontributory negligence may be found where a seaman has concealed material information about a pre-existing injury or physical condition from his employer; exposes his body to a risk of reinjury or aggravation of the condition; and then suffers reinjury or aggravation injury." *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 303-04 (5th Cir. 2008).[10] The seaman must "intentionally misrepresen[t] or concea[l] material medical facts, the disclosure of which is plainly desired," and the concealment must be "knowing." *McCorpen v. Central Gulf Steamship Corp.*, 396 F.2d 547, 548-49 (5th Cir. 1968).[11]

The defendant invokes *Johnson*, based on the plaintiff's completion of two post-employment physical examination reports, substantively identical to each other, in August 2004 and January 2005. The forms asked, "Does the applicant have or ever suffered from [sic] any of the following?" The plaintiff checked or indicated "no" on each entry. The defendant argues that the plaintiff's negative responses to four of the items were false and amount to concealment for purposes of a comparative negligence defense: impaired range of motion; impaired balance/coordination; recent or repetitive surgery; and other illness or disability not listed.

The Court rejects three of these proposed founts of comparative negligence. The plaintiff's only surgery was his 1989 arthroscopic surgery, which was neither recent nor repetitive. The defendant assumes the plaintiff had a limited range of motion in his left knee but offers no good evidence of it, and the Court finds the plaintiff had none. As for disability, the defendant relies on a treating physician's 1992 assignment of a 25% permanent partial disability rating to his left lower extremity, but the plaintiff did not know of that rating and so did not knowingly conceal it.

---

[10] The defendant cites no binding precedent for this proposition, but the plaintiff has not objected to its employment in this case.

[11] *McCorpen* arose in the context of maintenance and cure, but there is no reason to believe that a different construction of concealment would apply in the context of negligence or unseaworthiness. Certainly the parties do not offer an alternate construction.

The final challenged response denied any history of "impaired balance/coordination." This might suggest the inquiry was limited to dizziness, cerebellum issues and the like, except that the question is expressly directed to "musculoskeletal" problems, and "dizziness" and "nervous system" issues are addressed separately in the form. The disclosure of difficulties with balance caused by bone and joint problems was thus plainly desired by the question.

The correct answer to the inquiry was "yes," because the plaintiff has a medically documented history of his left knee "giving way" or "giv[ing] out" unexpectedly, with at least six but probably a dozen or more episodes in an 18-month period in 1991 and 1992, and an unpredictably collapsing knee undoubtedly interferes with balance. Although these episodes occurred a long time before 2004 and 2005, the forms the plaintiff filled out asked if he had "ever" experienced impaired balance.

The forms plainly required disclosure of these episodes, the plaintiff knew the forms required disclosure, and the plaintiff knew the correct response was in the affirmative. Had the plaintiff correctly answered the question, the defendant would have obtained the 1989-1992 medical records, discovered the plaintiff's torn/missing ACL, and rejected him for barge duty, because the rough and rolling seas such craft routinely experience would present an unacceptable risk of injury without the stabilizing influence of an intact ACL. By his concealment, the plaintiff exposed his body to a risk of re-injury or aggravation and ultimately suffered precisely that. The plaintiff was negligent in this regard.

The plaintiff's brief response is that he "had nothing to conceal, was not asked anything, and volunteered post-employment that his knee had been scoped." He also notes that another employee with a history of arthroscopic surgery on his knee worked on the tug. (Doc. 176 at 4). These excuses do not alter the Court's finding that the plaintiff was negligent.

First, and as discussed above, the plaintiff plainly was asked about impaired balance from bone and joint causes. Second, while he may or may not have felt he had anything to conceal, conceal he did. Third, although the plaintiff told the tug's chief

engineer during an informal, post-hire conversation that his knee had been scoped, the engineer did not relay that information to the defendant's medical personnel (who make decisions concerning fitness for duty), and he had no duty to do so.  Thus, the plaintiff's partial disclosure did not offset his concealment of his history from medical personnel. Fourth, the other employee working despite arthroscopic surgery did not have a torn or missing ACL; on the contrary, his damaged ACL had been repaired by the surgery. Thus, his employment at sea does not undermine the defendant's testimony that the plaintiff would not have been cleared for such work had his balance problems (and thus, eventually, his deficient ACL) been disclosed as requested.

The plaintiff was not negligent in any other respect including, without limitation, by not having reconstructive surgery on his ACL in the 1990's, by receiving a partial disability rating, or by pursuing maritime employment.[12]

The Court finds that the plaintiff's negligence contributed 20% to his injury.  His otherwise recoverable damages for the defendant's negligence and the unseaworthiness of its vessel will be reduced by this percentage.


### C.  Maintenance and Cure.

"[W]hen a seaman is injured or becomes ill while employed aboard a vessel, he is entitled to daily subsistence [maintenance] and medical treatment [cure] until his maximum cure has been reached."  *Kasprik v. United States*, 87 F.3d 562, 464 (11th Cir. 1996).  "[M]aximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition. [citations omitted] Thus, where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved."  *Pelotto v. L&N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979).

---

[12] The defendant suggests, without cogent explanation or relevant authority, that each of these constitutes comparative negligence.

The plaintiff has not reached maximum cure, because it is probable that further treatment in the form of a total knee replacement ("TKR") will improve his physical condition. The defendant argues the plaintiff reached maximum cure in June 2007, when a treating orthopedist said he had reached maximum medical improvement despite the presence of bone-on-bone contact, which resulted from rapidly worsening arthritis triggered by the accident. It is this bone-on-bone contact, however, that requires TKR. The bone-on-bone contact and resulting pain were fully present in and before June 2007, and the Court finds that the plaintiff required TKR in and before June 2007 and thus has never reached maximum cure.

The defendant argues that TKR would be merely palliative because, while it would reduce pain, it would not improve the function of the plaintiff's knee (which the defendant equates with "range of motion"). The test, however, is not improved function but improved condition, and TKR will improve the plaintiff's condition by eliminating some of the permanent restrictions with which he is now saddled. Moreover, while treatment that merely reduces pain without improving condition is not cure, treatment that improves condition by allowing remunerative activity previously precluded by pain does constitute cure, and TKR will accomplish just that.

"Maintenance and cure are due without regard to the negligence of the employer or the unseaworthiness of the ship." *Kasprik*, 87 F.3d at 564 (internal quotes omitted). Indeed, "it does not matter for maintenance and cure purposes whether [the employer] had any hand in causing" the plaintiff's injury. *Flores v. Carnival Cruise Lines*, 47 F.3d 1120, 1124 (11th Cir. 1995). Moreover, "[t]o recover in a maintenance and cure action, the seaman need not suffer from illness or injury that is causally related to his duties .... " *Id*. at 1123. Nevertheless, the accident – for which the defendant is responsible and which was directly related to the defendant's duties – was the precipitating event requiring TKR. A TKR is required by bone-on-bone contact. The bone-on-bone contact was caused by arthritic changes. Most of these arthritic changes occurred post-accident and were caused by the meniscal tears suffered in the accident, and by the resulting surgery.

The defendant notes that some arthritic changes were present before May 2006 and were caused by episodes of the knee giving way (caused by the deficient ACL), and it concludes that the need for TKR is thus "not causally related to" the accident. Although there was mild arthritis before the accident, without the accident there would not be arthritis sufficient to require TKR, or anything close to it. The accident is not merely related to the need for TKR but the primary cause of it.

"[A] seaman will not lose his right to maintenance and cure unless he engages in positively vicious conduct – such as gross negligence or willful disobedience of orders." *Garay v. Carnival Cruise Line, Inc.*, 904 F.2d 1527, 1530 (11th Cir. 1990) (internal quotes omitted); *accord Flores*, 47 F.3d at 1123 (maintenance and cure is available "as long as the seaman's incapacitation did not result from his own willful misconduct"). The plaintiff was not guilty of willful misconduct or gross negligence.

"A seaman may recover maintenance and cure even for injuries or illnesses pre-existing the seaman's employment unless that seaman knowingly or fraudulently concealed his condition from the vessel owner at the time he was employed." *Jauch v. Nautical Services, Inc*., 470 F.3d 207, 212 (5th Cir. 2006)*; accord Mobil Oil Corp. v. Oil, Chemical and Atomic Workers International Union*, 504 F.2d 272, 274 n.6 (5th Cir. 1974); *McCorpen* , 396 F.2d at 548; *cf. Frederick* , 205 F.3d at 1284 (upholding award of maintenance and cure for a fall that aggravated a pre-existing condition). "[W]here a shipowner requires a seaman to submit to a pre-hiring medical examination or interview and the seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired, then he is not entitled to an award of maintenance and cure." *McCorpen*, 396 F.2d at 549. The defendant did not require the plaintiff to submit to a pre-hiring medical examination or interview, and he was asked no pre-hire questions concerning his medical history. He therefore did not intentionally misrepresent or conceal any pertinent medical facts in connection with his hiring.

The defendant argues that McCorpen "should" apply to post-hire medical examinations, but appellate cases continue to limit *McCorpen* to a pre-hire situation. *See Johnson*, 544 F.3d at 301 (for *McCorpen* to apply, the concealed information must have

been material "to the employer's decision to hire the seaman"); *Brown v. Parker Drilling Offshore Corp*., 410 F.3d 166, 171 (5th Cir. 2005) (same); *Jauch,* 470 F.3d at 212 (for *McCorpen* to apply, the plaintiff must have concealed his condition "at the time he was employed"). The defendant's unsupported argument is rejected as contrary to law.

"Where the shipowner does not require a pre-employment medical examination or interview, the rule is that a seaman must disclose a past illness or injury only when in his own opinion the shipowner would consider it a matter of importance. ... [The defendant] will be liable if it is found that there existed reasonable grounds for the seaman's good-faith belief that he was fit for duty." *McCorpen*, 396 F.2d at 548-49. The plaintiff at the time of his hiring subjectively and reasonably believed that he was fit for duty and that the defendant would not consider his 1989-1992 history a matter of importance. The defendant's dogged effort to expand *McCorpen* beyond its terms is rejected for reasons set forth in a previous order. (Doc. 116).

Because the plaintiff has not reached maximum cure and did not misrepresent or conceal his condition or improperly fail to disclose it, he is entitled to additional maintenance and cure until maximum cure is reached. Maximum cure will be reached three months after TKR, which will occur within three months of this order. Thus, the plaintiff will reach maximum cure six months after the date of this order.

"[W]here a CBA fixes a maintenance rate, the court should accept it as reasonable." *Frederick* , 205 F.3d at 1291. "[W]e hold that where a CBA fixes a maintenance rate, the CBA rate applies even if the seaman spent substantially more for maintenance." *Id*. at 1292. The collective bargaining agreement covering the plaintiff and defendant establishes the rate of maintenance at $15.00 per day.

The plaintiff was paid maintenance at $15 a day for 320 days, through April 14, 2007, a total of $4,800. Although the defendant paid no further maintenance as such, in 2007 it paid the plaintiff an additional $20,556 as an "advance." The defendant claims this sum as a credit against additional maintenance, and the plaintiff offers no objection. This sum satisfies the defendant's maintenance obligation through January 14, 2011. The

defendant is required to pay the plaintiff $15 a day maintenance from January 15, 2011 through February 25, 2011, a total of $630.

The defendant has paid for the plaintiff's cure to date except for the charges of his current orthopedist. The defendant owes the plaintiff $1,539 in unpaid past cure.

Future cure is limited to TKR and post-op physical therapy. The cost of TKR is $54,505,[13] and the cost of physical therapy is $3,420. Total cost of future cure is $57,925.[14]

"[I]n an action for maintenance and cure, both reasonable attorney's fees and punitive damages may be legally awarded in a proper case – that is, upon a showing of a shipowner's willful and arbitrary refusal to pay maintenance and cure." *Atlantic Sounding Co. v. Townsend*, 496 F.3d 1282, 1284 (11th Cir. 2007) (internal quotes omitted), *aff'd*, 129 S. Ct. 2561 (2009). No claim for punitive damages was included in the complaint, and the Court has denied a motion to amend the complaint to include such a claim. (Doc. 114). This state of affairs precludes an award of punitive damages.

The defendant did not willfully or arbitrarily refuse to pay maintenance and cure. The June 2007 opinion of the treating orthopedist that the plaintiff had reached maximum medical improvement gave the defendant grounds to question the later opinion of another

---

[13] This includes the hospital charge (both surgery and three days' stay), the surgeon's charge, the anesthesiologist's charge, and the hardware cost.

[14] The defendant objects vaguely that, because the plaintiff resides in St. Louis and the figures in text were provided by a Louisiana orthopedic surgeon, those figures violate "the asserted locality Rule." (Doc. 154 at 6). Case law employs that term to describe a test for admiralty jurisdiction and the relevant area for assessing the standard of care in a medical malpractice case, but the defendant does not support the existence of such a rule in determining medical costs. The Court will not search for such support on the defendant's behalf. However, it should be noted that the defendant's position is very nearly foreclosed by *Caulfield v. AC&D Marine, Inc*., 633 F.2d 1129, 1135 (5th Cir. 1981), which placed the burden on the defendant in a maintenance-and-cure case to show that the costs incurred by the physician of the plaintiff's choosing exceeded those that would have been incurred had the plaintiff used the physician of the defendant's choosing. The defendant has offered no evidence to meet such a burden.

orthopedist that TKR was presently required.[15]  By the time its selected orthopedist concurred, the defendant had evidence that the plaintiff misrepresented, concealed or wrongfully failed to disclose his condition and was thus barred from receiving maintenance and cure.  That the defendant proved wrong on all counts does not establish that its refusal was willful or arbitrary.

### D.  Damages.

The plaintiff seeks the following elements of damages under his negligence and unseaworthiness claims:  (1) past and future medicals; (2) past wage loss; and (3) future economic loss.  (Doc. 117 at 37).  These are the only forms of damage preserved in the joint pretrial document which, when adopted by the Court as part of the final pretrial order, "shall constitute the final statement of the … relief at issue [and] shall constitute the basis for any relief afforded by the Court."  (Doc. 29, Attachment at 4).  The final pretrial order, which incorporated by reference the joint pretrial document, echoed that it "shall … form the basis for any relief afforded by the Court."  (Doc. 120 at 1-2).

In his post-trial brief, the plaintiff attempts to expand the forms of relief to seek damages for pain and suffering, post-TKR disability rating, economic hardship, depression, and punitive damages.  (Doc. 160 at 38).[16]  The defendant elected to oppose a

---

[15] The plaintiff incorrectly says this orthopedist recommended that TKR be performed in 2007.  In fact, he said only that TKR would be required in the plaintiff's "lifetime" and that "at some point" he would require TKR if his pain did not improve.

[16] The plaintiff preserved a claim for "general damages," which might encompass pain and suffering, depression and economic hardship, except that he specified the general damages were for the post-accident arthroscopic surgery and the yet-to-come TKR only.  (Doc. 117 at 37).  Thre is no allegation or evidence that the arthroscopic surgery caused the plaintiff depresion or economic hardship and no allegation or evidence that the future TKR procedure will cause him depression, economic hardship or pain and suffering, and the Court finds no such damages.

The joint pretrial document's reference to general damages does not preserve a claim for punitive damages, because punitive damages are not a component of general damages.  *E.g., Karim v. Finch Shipping Co.*, 265 F.3d 258, 262 (5th Cir. 2001); *Archer v. Trans/American Services, Ltd.*, 834 F.2d 1570, 1572 (11th Cir. 1988).

pain and suffering award and a disability rating award on the merits and without objecting that these elements were not preserved in the pretrial order. (Doc. 167 at 15, 38-40). Therefore, the Court will entertain the plaintiff's request for such damages as having been tried by consent. The other forms of relief injected into the proceedings after trial, however, are not part of this case and will not support an award of damages. Awards for the remaining categories of damages are subject to a 20% discount to reflect the plaintiff's negligence.

### 1. Medicals.

The plaintiff is entitled to compensation for past and future medical expenses caused by the accident. As discussed in Part C, the past unpaid medicals total $1,539, and the future medicals for TKR and post-op physical therapy total $57,925.

The plaintiff also seeks additional, post-cure medicals, including office visits with his orthopedist, x-rays, and future revision of his TKR. The Court finds that the plaintiff will need three follow-up office visits, with x-rays, within two years of TKR and that they will cost $300 each for a total of $900.

While the plaintiff may require some additional attention to his knee eventually, what that attention will be and what it will cost are purely speculative matters.[17] Based on the testimony of the plaintiff's orthopedic surgeon, the Court finds that it will probably be 20 years before any follow-up is required; that the possible extent of that follow-up ranges with equal likelihood from minimal to major; and that future medical technology, procedures and costs for whatever future treatment may be indicated are all unknown and unknowable. The plaintiff is not entitled to compensation as to these claimed damages.

---

[17] Damages should not be awarded under the Jones Act and general maritime law based on speculation. *Flores*, 47 F.3d at 1125; *accord Griffin v. Oceanic Contractors, Inc.*, 664 F.2d 36, 40 (5th Cir. 1981).

The plaintiff's total recoverable damages for medical expenses that also constitute cure, before considering comparative negligence, are $59,464.  After reduction, the plaintiff is entitled to an award of $47,571.

The plaintiff's total recoverable damages for medical expenses that do not constitute cure, before considering comparative negligence, are $900.  After the comparative negligence reduction, the plaintiff is entitled to an award of $720.

### 2.  Past wage loss.

The plaintiff has been totally incapacitated from any gainful employment because of the accident and will remain so until completing recuperation from TKR.  The plaintiff is entitled to past lost wages from June 1, 2006 through the date of this order.  But for the accident, the plaintiff would have continued to earn $40,824 a year through the date of this order.[18]  The plaintiff also would have continued to receive $4,975 in annual insurance benefits and $3,645 annually for meals.[19]  The after-tax total of these past losses is $182,054.[20]  After redution for comparative negligence, the plaintiff is entitled to an award of $145,643.

### 3.  Future economic loss.

The defendant offers several reasons why the plaintiff should receive no award for future economic loss.  First, in its motion for judgment on partial findings made at the close of the plaintiff's case, the defendant argued that the plaintiff could not prove lost future earnings because the report of his economic expert, in its reduction of the

---

[18] The day rate increased to approximately $270 in 2007, but the number of days worked decreased, resulting in an approximately equal offset.

[19] The fair market value of fringe benefits must be included in an award.  *Deakle*, 756 F.2d at 830.

[20] In his final brief, the plaintiff requests prejudgment interest on this amount.  (Doc. 176 at 13).  The plaintiff did not preserve any demand for prejudgment interest in the pretrial order, (Doc. 117 at 37), and it is therefore not part of the case and may not be awarded.

plaintiff's lost future earnings to present value, did not employ the below-market discount method required by *Culver v. Slater Boat Co.*, 722 F.2d 114 (former 5th Cir. 1983) (en banc) ("*Culver II*"). Without objection, the Court agreed to leave this motion open, with its merits unaffected by the defendant's presentation in its case of expert economic opinion based on *Culver II*.

It is clear that the report of the plaintiff's expert does not employ the below-market discount rate method required by *Culver II*. Instead, it uses a nominal interest rate of 4.5%. However, the expert in his deposition testimony made clear that he utilized an inflation rate of 3.5% in calculating the plaintiff's lost future income and that, had he used the below-market discount method, he would have used the same inflation rate and a below-market discount rate of 1%. He also testified that, had he used the below-market discount rate method, his figures for the present value of lost income would have been exactly the same (because the 3.5% would have been deducted from both the future income stream and the discount rate). The plaintiff thus presented expert evidence of a below-market discount rate and of lost income using that method. The defendant's motion for judgment on partial findings is due to be denied in this respect.

The defendant also suggests in passing that the plaintiff should receive no award for lost future earnings because his pre-existing condition disqualified him from employment with the defendant. (Doc. 167 at 9 n.33). This is the entirety of the defendant's argument, which is unsupported by discussion or authority. It appears also to be in conflict with *Johnson*, which limits the effect of a wrongful non-disclosure of a pre-existing condition to a reduction of damages based on comparative negligence, not the elimination of all economic damages.

Next, the defendant argues that the plaintiff will have no lost earnings after recuperating from TKR because he can be trained to work in computer-assisted design, a profession in which earnings exceed those he can make as an able-bodied seaman. It would take at least two years of training for the plaintiff to become qualified for this work, so the defendant is arguing that the plaintiff has a duty to undergo that training in order to mitigate his losses. Failure to mitigate damages, however, is an affirmative

defense and is waived by the failure to plead it.  *Frederick*, 205 F.3d at 1286-87.  Neither the defendant's answer nor the joint pretrial document preserves failure to mitigate as a defense, so it is not in the case.  At any rate, the Court finds that the plaintiff (who at age 46 has no employment history outside manual labor and who has not been adequately evaluated to determine his aptitude for computer-assisted design), without fault of his own, would not succeed in completing the necessary training for such work and therefore cannot perform it.

As its fourth and final effort to eradicate lost future earnings in their entirety, the defendant argues that, since TKR has not occurred, the plaintiff's future earning capacity is unknown and any award thus speculative.  The defendant insists this result is compelled by the Court's decision in *Baucom v. Sisco Stevedoring, LLC*, 560 F. Supp. 2d 1181 (S.D. Ala. 2008), but that case is plainly inapposite.  In *Baucom*, "[t]here [wa]s absolutely no basis in the record for assigning any sort of probability to this broad continuum of potential outcomes" of future surgery.  *Id*. at 1204.  Here, there is a wealth of evidence that TKR outcomes are almost always good and will restore to the plaintiff the physical ability to perform jobs in the sedentary and light work categories, and the Court finds the plaintiff will have this result.[21]

The Court finds that the plaintiff will have TKR within three months from the date of this order and that his three-month recuperation period will end six months from the date of this order.  The Court finds that the below-market discount rate, real growth rate and tax rate assumed by the defendant's expert best represent economic reality, and they

---

[21] There is conflicting evidence as to whether TKR will enable the plaintiff to engage in work at the medium exertional level; the Court finds that it will not.  This finding disposes of the defendant's argument that the plaintiff can return to his prior employment as a warehouse manager and earn more than he did with the defendant.  The defendant presented no evidence as to the exertional level of such employment, and the Court declines to speculate that it is light or sedentary.  Moreover, the defendant's own witness testified that many such jobs would be unavailable to the plaintiff without training, and the Court declines to speculate that the plaintiff can obtain such employment without training.  As noted in text, any job requiring training requires a mitigation of damages, which the defendant did not preserve as an issue.

will be utilized.  Using these figures, the post-tax, present value amount of the plaintiff's foregone wages and fringe benefits for this six-month period is $23,722.  Reduced by comparative negligence, the amount is $18,978.

The Court finds that the plaintiff, upon recuperation from TKR, will be able to find light or sedentary employment in the St. Louis area as a security guard or information clerk at $11.00 per hour, or $22,800 a year.  The Court finds that the plaintiff has a remaining worklife, beginning six months after the date of this order, of 16.2 years.[22]  Using the below-market discount rate, real growth rate and tax rate proposed by the defendant's expert, the post-tax, present value amount of the plaintiff's foregone wages for the remainder of his worklife is $215,436.  Using the same rates, the post-tax, present value amount of the plaintiff's foregone fringe benefits for the remainder of his worklife is $103,997.[23]

The plaintiff's total recoverable damages for post-cure economic losses, before considering comparative negligence, are $319,433.  After the comparative negligence reduction, the plaintiff is entitled to an award of $255,546.


**4.  Pain and suffering.**

The plaintiff experienced severe pain at the time of the accident and for several days thereafter, before receiving prescription pain medications.  Following surgery, he underwent several months of physical therapy, which improved his mobility but at the cost of increased, stabbing pain.  Even as this period ended, the plaintiff experienced a fresh source of pain as the rapidly worsening arthritis triggered by the accident allowed bone-on-bone contact, a condition that continues and will remain until TKR.  The plaintiff has  taken prescription medications (Vicodin and Naproxyn) consistently, if not

---

[22] The plaintiff offered no reason the Court should accept his lawyers' assumption he will work until age 67, several years past the average date testified to by the defendant's expert.

[23] The defendant did not address what, if any, fringe benefits alternate employment as a security guard or information clerk would carry, and the Court finds they would carry none.

daily, for over four years to control the pain. The pain is sufficient to keep him from engaging in various physical activities he enjoys. The plaintiff's pain level is fairly low when at rest, but the discomfort still interferes with the length and quality of his sleep. The medical testimony reflects that the plaintiff's description of his pain is not exaggerated but is consistent with what would be expected from his condition. The plaintiff's pain will continue until TKR, which will eliminate it.

The plaintiff's total recoverable damages for pain and suffering, before considering comparative negligence, are $100,000. After the comparative negligence reduction, the plaintiff is entitled to an award of $80,000.

### 5. Disability rating.

The parties agree that a successful TKR will leave the plaintiff with a left lower extremity disability rating of 37-50%. (Doc. 160 at 38; Doc. 167 at 15). The plaintiff suggests this should be worth at least $200,000, but he provides no basis for drawing such a conclusion. A disability rating is not itself a compensable element of damage, although it might suggest a possible loss of enjoyment of life, which several courts have assumed is compensable.[24] However, the plaintiff has not shown that any non-work aspect of his pre-accident life more likely than not will be impaired by his post-TKR situation. The Court finds that the plaintiff will not experience any loss of enjoyment of life following his TKR.[25]

---

[24] *E.g., Simeonoff v. Hiner*, 249 F.3d 883, 893 (9th Cir. 2001); *Havinga v. Crowley Towing & Transportation Co*., 24 F.3d 1480, 1484 (1st Cir. 1994); *Chiasson v. Zapata Gulf Marine Corp*., 988 F.2d 513, 517 (5th Cir. 1993).

[25] The plaintiff did not request an award for loss of enjoyment for the period between the accident and his TKR.

### 6. Additional defense arguments.

"[W]hen a plaintiff has a preexisting condition that would inevitably worsen, a defendant causing subsequent injury is entitled to have the plaintiff's damages discounted to reflect the proportion of damages that would have been suffered even in the absence of the subsequent injury, but the burden of proof in such cases is upon the defendant to prove the extent of the damages that the preexisting condition would inevitably have caused." *Maurer v. United States*, 668 F.2d 98, 100 (2nd Cir. 1981).[26] The defendant asserts that the plaintiff would inevitably have suffered either a torn meniscus or severe arthritis necessitating TKR, or both, even absent the accident, but the Court finds to the contrary.

Many persons live for decades without an ACL and experience neither of these conditions. The mere presence of a torn/missing ACL does not cause arthritis; episodes of twisting that damage other structures (such as a meniscus) cause arthritis. The plaintiff compensated well for his condition by maintaining muscular support and taking care to avoid twisting his knee, and in 17 years post-ACL injury he developed only mild arthritis. The plaintiff was thus well positioned to live decades more without tearing his meniscus or developing severe arthritis.

As noted, the plaintiff's treating physician in 1992 assigned him a 25% permanent partial disability rating to his left lower extremity. The defendant argues it can be liable only for any increase in disability above 25% caused by the accident. As noted in Part D.4, disability rating is not an element of damages, and the plaintiff has not established any loss of enjoyment of life. To the uncertain extent the defendant intends to suggest the plaintiff's recovery of medical expenses and lost income should be reduced to reflect his historical disability rating, it offers no authority for the proposition, which the Court rejects; the mere existence of that rating has no connection with the incurring of these losses.

---

[26] The parties accept the employment of this principle in this case. (Doc. 167 at 15; Doc. 176 at 8).

## CONCLUSION

For the reasons set forth above, the Court finds that the defendant is liable to the plaintiff for negligence and unseaworthiness; that the plaintiff's damages attributable to the defendant's negligence and the unseaworthiness of its vessel is $685,573;[27] that this amount is decreased by 20%, to $548,458, to account for the plaintiff's comparative negligence; that the defendant is liable to the plaintiff for maintenance in the amount of $630; that the defendant is liable to the plaintiff for past and future cure in the amount of $59,464; and that the defendant is not liable to the plaintiff for prejudgment interest, attorney's fees or punitive damages. Judgment shall be entered accordingly by separate order.[28]

---

[27] The components of this amount are as follows:

| | |
|---|---|
| Medicals also constituting cure | $59,464 |
| Future medicals not constituting cure | 900 |
| Past wage loss | 182,054 |
| Future wage loss | 343,155 |
| Pain and suffering | 100,000 |

[28] The judgment amount includes the following elements:

| | |
|---|---|
| Cure | $59,464 |
| Maintenance | 630 |
| Future medicals | 720 |
| Past wage loss | 145,643 |
| Future wage loss | 274,524 |
| Pain and suffering | 80,000 |

The judgment is $560,981. This is because the damages awarded as medicals under the negligence and unseaworthiness claims are primarily redundant with those awarded as cure and, (Continued)

DONE and ORDERED this 26th day of August, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

to avoid a double recovery, the judgment amount includes the higher amount awarded as cure ($59,464) and omits the lower amount ($47,571, due to comparative negligence) awarded under the negligence and unseaworthiness claims.  Were the cure award to be reversed on appeal, the judgment would still allow the plaintiff to recover the lower amount as past and future medicals.